[No. 6242.]

COUNTY COMMISSIONERS OF BENT COUNTY, ET AL. V. ATCHISON, TOPEKA AND SANTA FE RAILWAY CO.

1. TAXATION—*Enjoining Collection of Tax*—Public interest, statutory enactment, and judicial announcement, are opposed to interference by injunction with the collection of public revenues. Whoever seeks such relief must bring his case within some recognized ground of equitable jurisdiction. Mere errors, excessive valuation, the hardship or injustice of the law, or any grievance which can be remedied by an action at law, either before or after the payment of the tax, will not justify interposition by injunction—(612, 613).

2. COUNTIES—*Board of Commissioners—Contracts—Validity*—The commissioners of Bent County in August, 1904, let a contract for the repair of a certain public bridge. There was then upon hand in the proper fund a sum sufficient to defray the contract price of the agreed repairs. The contract was a lawful one, though the particular work in question was not in contemplation at the time of levying the tax by which the fund was created, even though the fund had been exhausted in necessary repairs of other bridges and public roads before the repairs contracted for

were completed, so that warrants therefore could not be issued, and though it was known at the time of the contract that the amount in the fund would be otherwise consumed if the ordinary and necessary repairs to the public roads and bridges were carried on; and it was immaterial what occasioned the necessity of these repairs, which absorbed the fund, or what knowledge the commissioners had of this necessity—(616).

The levy of a special tax to discharge the amount due under the contract in question was held to be authorized by sec. 4 of the act of April 1, 1891, (Laws 1891, 112)—(617).

3.   TAXATION—*Counties—Authority to Levy Special Tax to Pay Floating Debt*—So much of sec. 4 of the act of April 1, 1891, (Laws 1891, 112) as authorized the levy of a tax for paying outstanding warrants and floating indebtedness is still in force, notwithstanding the provisions of chapter 133 of the acts of 1899.

And such levy may be made though the indebtedness has not been reduced to judgment—(618).

4.   ——*Construction of Levy*—A levy was designated as "For Special Fund." The amount to be raised thereby was, by resolution of the board, adopted pursuant to the statute (Laws 1891, 111, sec. 1, Rev. Stat. sec. 1215) appropriated, "For liquidation, payment and redemption of unliquidated and unpaid amounts"—(619).

Held that the levy and the appropriation were to be construed together, and as thus considered the levy was made certain—(619).

5.   SUPREME COURT—*Stipulation of Counsel as Conferring Jurisdiction*—Action to restrain the collection of a special tax. The complaint showed no grounds of equitable jurisdiction; but counsel had stipulated that if the tax was adjudged illegal the injunction should be perpetuated. In view of this stipulation the court investigated the legality of the tax, but it was declared that in another like case this would not be regarded as a precedent—(614, 615).

*Error to Bent District Court.*—HON. HENRY HUNTER, Judge.

Mr. ALLEN M. LAMBRIGHT and Messrs. NORTHCUTT & McHENDRIE, for plaintiffs in error.

Mr. HENRY T. ROGERS and Mr. GEORGE A. H. FRASER, for defendant in error.

Mr. JUSTICE WHITE delivered the opinion of the court:

In August, 1904, unusual and unprecedented floods washed away or destroyed the bridges across the natural streams in Bent county, and otherwise materially damaged the public roads. Thereafter, and on August 30, 1904, the board of county commissioners entered into a contract in the sum of $5700. for the rebuilding of a span of a bridge, so destroyed, across the Arkansas River, known as the Caddoa bridge. When the contract was entered into there was in the county treasury, belonging to the proper fund, a sum in excess of the contract price of the repairs, but it was known to the board of county commissioners that nearly all of such fund, together with the contingent fund, would be consumed by the ordinary expenses of maintaining the roads and bridges, aside from the repairs in question, and if the Caddoa bridge was repaired, and the ordinary expenditures for roads and bridges made, the road and bridge fund for the fiscal year would not equal such total expenditures by about $3900. Subsequent to the making of the contract, but prior to the completion of the repairs, the commissioners caused other work to be done upon the roads and bridges of the county, and drew warrants for the cost thereof, which were paid, so that upon the completion of the Caddoa bridge there had been paid on the contract price thereof only the sum of $1800., leaving a balance of $3900. after the road and bridge fund, and the contingent fund for the fiscal year were exhausted.

Such was the condition of the county's affairs on November 30, 1904, at the time of making the general

tax levy for the fiscal year of 1905. The levy then made included, *inter alia,* 8 mills on each one dollar valuation "For ordinary county revenue fund;" 1.5 mills "For county poor;" 1 mill "For county contingent fund;" and 2.5 mills "For special fund." The sum of $3900. which would arise from the 2.5 mill levy was appropriated "For liquidation, payment and redemption of unliquidated and unpaid amounts." The levy, under the designation "special fund," and the appropriation thereof, was made, set aside and intended for the payment of the balance of the debt incurred by the repairs on the Caddoa bridge. Neither the separate nor aggregate levies for the different purposes for which levies were made for the fiscal years of 1904 and 1905 equalled the rate or amount that might have been levied under the limitation imposed by law in counties of the eighth class, to which Bent county belongs.

Thereafter, at the beginning of the fiscal year of 1905, warrants were drawn upon the "special fund" in favor of the contractors who made the repairs on the Caddoa bridge, and were paid by the county. Subsequently, the defendant in error, which operates a railroad through Bent county, paid all taxes assessed against it for the fiscal year of 1905, except solely the 2.5 mills levied as a "special fund," and prosecuted a suit in the district court to enjoin procedure by the proper officers to collect the same. The injunction was granted, and the defendants in that suit bring the cause here for review on error.

Public interest, judicial announcement, and, in this state, statutory enactment, are opposed to injunctive interference in the collection of the public revenues.—*State Railroad Tax Cases,* 92 U. S. 575, 613, 614; *Dows v. City of Chicago,* 11 Wall. 108; *Hannewinkle v. George-*

*town,* 15 Wall. 547; *City of Highlands v. Johnson,* 24 Colo. 371; *Woodward v. Ellsworth,* 4 Colo. 580; *Price v. Kramer, Idem* 546; *Ins. Co. of No. Amer. v. Bonner,* 7 Colo. App. 97, section 5750, R. S.

The policy of non-interference by the courts with the process of collecting the taxes on which the state depends for its continued existence, "is founded in the simple philosophy derived from the experience of ages, that the payment of taxes has to be enforced by summary and stringent means against a reluctant and often adverse sentiment; and to do this successfully, other instrumentalities and other modes of procedure are necessary, than those which belong to courts of justice."—*State Railroad Tax Cases, supra.*

In *Dows v. City of Chicago, supra,* cited and quoted from in the State Railroad Tax Cases, *supra,* after commenting upon the necessary reliance of the state governments upon the prompt collection of the taxes for their support and maintenance, and the ill consequences of interference with their proceedings in that matter, it is said:

"No court of equity will, therefore, allow its injunction to issue to restrain their collection, except where it may be necessary to protect the rights of the citizen whose property is taxed, and he has no adequate remedy by the ordinary processes of the law. It must appear that the enforcement of the tax would lead to a multiplicity of suits, or produce irreparable injury, or where the property is real estate, throw a cloud upon the title of complainant, before the aid of a court of equity can be invoked."

While, perhaps, no absolute limitation has been placed upon the powers of courts of equity in restraining the collection of illegal taxes, it is settled beyond question that "in addition to illegality, hardship, or irregularity,

the case must be brought within some of the recognized foundations of equitable jurisdiction, and that mere errors or excess in valuation, or hardship, or injustices of the law, or any grievance which can be remedied by a suit at law, *either before or after payment of taxes,* will not justify a court of equity to interpose by injunction to stay collection of a tax."—State Railroad Tax Cases, *supra.*

So recognizing the law, and appreciating the necessity of prompt payment of the public revenue as an essential prerequisite to efficient government, the general assembly enacted a law that,  *  *  * "in all cases where any person shall pay any tax, interest or cost, or any portion thereof, that shall thereafter be found to be erroneous or illegal, whether the same be owing to erroneous assessment, to improper or irregular levying of the tax, or clerical or other errors or irregularities, the board of county commissioners shall refund the same without abatement or discount to the taxpayer.—Sec. 5750, R. S., *supra.*

We do not hold that this statute affords an adequate remedy to the taxpayer in all cases founded upon an erroneous or illegal tax. We readily conceive that a case might arise in which the complainant would not have an adequate remedy by an action at law based upon the statute. Facts like those in *Cummings v. National Bank,* 101 U. S. 153, would bring a case within the exception. The case at bar, however, is not within the exceptions recognized by the authorities, and the trial court erred in taking jurisdiction of the case. Nevertheless,' as the parties stipulated in the trial of the cause that the sole question involved was the legality of the tax in question, and if the tax was found to be illegal, the injunction should be made permanent, regardless of the

lack or existence of other features of equitable cogniz-
ance, we shall determine the matter upon its merits, but
shall not consider ourselves bound to so proceed in other
causes of similar import that may hereafter be brought
before us.

.   The trial court held, and the defendant in error
maintains, that the contract for the repairs on the Cad-
doa bridge was void, for the reason that when it was
entered into there was not sufficient money in the county
treasury belonging to the proper fund out of which pay-
ment for such repairs could be made.   The holding of
the court, and the assumption of counsel in that respect
has no support in the record.   On the contrary, the stipu-
lation of the parties is to the effect, that the contract for
the repairs was made on the 30th day of August, 1904;
that on said date "there was in the proper fund sufficient
money to pay for the construction of said bridge;" that
the fund so on hand was afterwards consumed in the
necessary repairs of other bridges and roads before war-
rants could be issued for the contract in question.

As far as the legality of the contract is concerned,
we think it wholly immaterial as to what caused the nec-
essity for the work, or what knowledge the commission-
ers had as to the necessity of doing other work, or the
necessary expenditures therefor.   The primary duty rests
upon the state to open, construct and maintain public
highways, and such duty, in part, at least, has been im-
posed by such sovereign power upon the counties, and
entrusted to the various boards of county commissioners
therein.

The county commissioners, within the legitimate
limits of their power, brought into existence for the fiscal
year of 1904, a specific fund for "Roads and Bridges" in
Bent county.   Such commissioners had exclusive power

over that fund, and it could be expended under their
direction in such manner as seemed to them most advan-
tageous to the interest of the county for the opening, con-
struction, maintenance or repair of any public roads or
bridges therein.    If, in the judgment of the commission-
ers, it was necessary to do the repair work in question,
the cost thereof could properly be charged against the
road and bridge fund.    And if there was a sufficient
credit to such fund at the time of entering into the con-
tract, it was a legal contract, notwithstanding the par-
ticular work was not contemplated at the time the levy
was made, and it was known that the amount credited
to such fund by the levy would be thereafter otherwise
consumed, if the ordinary work, necessary to keep the
roads and bridges in repair, was performed.    Every ele-
ment and thing essential to the making of a valid contract
existed and was present when the Caddoa bridge contract
was made.    The necessary money was in the fund.    No
orders or obligations had depleted it below the sum cov-
ered by the contract in question.    Moreover, the contract
covered one of the very purposes for which the fund was
raised and could be expended, that is, for roads and
bridges.    It, therefore, constituted a valid and binding
obligation of the county.    If any contracts for road and
bridge work, or claims allowed against such fund were
illegal, they were contracts made and claims allowed sub-
sequent to the making of the contract in question.—
*Hockaday v. Board of County Commissioners,* 1 Colo.
App. 362.

It is claimed, by defendant in error, that the board
of county commissioners, in making the levy assumed to
do so under the authority of the legislative act, Session
Laws 1893, chapter 54, pp. 100-102, but failed to comply
with the essential requirements of that act; and further,

that the act only contemplated the creation of a fund for the payment of debts other than those existing prior to its enactment; and moreover, that such act had been repealed by that of 1899 Session Laws, chapter 133, pp. 329-331; sections 1185, 1186, 1187, R. S., and that so much of the act of 1891 Session Laws, p. 111, being section 4 thereof, that would seem to justify the levy was likewise repealed.

It may be, though we shall not now determine, that the purpose and intent of the act of 1893, was as defendant in error contends, though it is certain the act contains expressions that might include indebtedness subsequently incurred. However that may be, we think the levy can be sustained, without reference to the existence, non-existence or purpose of that act. We think that an essential part of section 4 of the act of 1891 sufficient to support this levy, was in no wise affected by the act of 1899. The latter act, as it applies to the county in question, authorizes the levy of not to exceed 16 mills on each dollar of valuation "for ordinary county revenue, including the support of the poor and for the purpose of raising a fund to meet any unforseen contingencies," and an unlimited rate "for the erection, maintaining, repairing, leasing or renting of county buildings, for roads and bridges, bonds and interest thereon, or judgment bonds and interest thereon, and for school purposes." When we consider the several purposes enumerated in the statute for which taxes shall be levied, it is apparent that no provision is made therein for the raising of a fund "for the purpose of paying outstanding warrants and for floating indebtedness." However desirable it may be that the affairs of the several counties be conducted on a cash basis, from the revenues derived each year from taxation, it is a matter of common knowledge that to do so is practically

impossible, and the general assembly has frequently recognized the fact and made provision therefor. By section 1183 R. S., it recognized the probability of judgments being rendered against counties, and made provision for their payment, and in 1891 did likewise relative to "outstanding warrants and other floating indebtedness." And this court has held that where a valid county indebtedness was incurred, presently payable, during one fiscal year, but for any reason was not paid therein, it becomes the duty of the county authorities to make provision for the payment of such indebtedness at the earliest possible moment when it can legally do so, which would be at the time of making the levy and appropriation for the succeeding fiscal year.—*Board of County Commissioners of La Plata Co. v. Hampson, 24 Colo. 127.*

Possessing such knowledge, we do not think it reasonable or probable that the general assembly intended to make it impossible for a county to pay a valid indebtedness previously incurred, from funds arising from taxes levied in a subsequent year, unless the indebtedness be first reduced to judgment. To do so would be useless and absurd. Such, however, would be the effect of the legislation if all of section 4 of the act of 1891 was repealed by the act of 1899. This is true, for the latter act does not authorize the raising of a fund for the payment of a debt previously contracted. The expression "for ordinary county revenue" as used in the statute must necessarily mean the sum or amount set aside for the ordinary expenses, such as the payment of officers, expenses of courts, etc., and in no sense a debt previously existing, the latter not coming within the ordinary or usual. Neither would it fall within an unforeseen contingency. A fund, to meet an unforeseen contingency must necessarily refer

to something which at the time of the levy was unknown, and which may subsequently happen. So viewing the matter, we feel justified in holding that the authority vested in the board of county commissioners by section 4 of the act of 1891, to levy "for the purpose of paying outstanding warrants and other floating indebtedness, not more than three mills on the dollar" was not repealed by the act of 1899, and remains in full force and effect. The several statutes pertain to the same general subject and are *in pari materia,* and must be taken and considered together. We uphold this clause of the section, because there is nothing in the subsequent act inconsistent therewith—*Dunton v. People,* 36 Colo. 128.

It, therefore, follows that the levy is valid, unless designating it "special fund" makes it void. While such designation is indefinite, nevertheless, we think it sufficient when aided, as it is, by the annual appropriation resolution. The statute requires the commissioners to pass a resolution to be termed the annual appropriation resolution for the next fiscal year, at the same time that the county levy of taxes is made. It also requires the specification therein of the objects and purposes for which such appropriations are made, and the amount appropriated for each object or purpose. Sec. 1215, R. S. The resolution sets aside the sum raised by the special fund "for liquidation, payment and redemption of unliquidated and unpaid amounts." This we think sufficient, as that which was uncertain is thereby made certain. The act of levying and the act of appropriation must necessarily be construed together. The judgment of the trial court was wrong, and is, therefore, reversed, with directions to dissolve the injunction, and dismiss the complaint.              *Judgment reversed.*

Mr. JUSTICE MUSSER and Mr. JUSTICE BAILEY concur.

Decided May 6, A. D. 1912. Rehearing denied July 1, A. D. 1912.